**MOUNTAIN STATES DIVISION NO. 17, COMMUNICATIONS WORKERS OF AMERICA v. MOUNTAIN STATES TELEPHONE & TELEGRAPH CO.**

**Civ. No. 2445.**

United States District Court
D. Colorado.
Aug. 16, 1948.

Dickerson, Morrissey & Zarlengo and Thomas J. Morrissey, all of Denver, Colo., and Everett E. Cotter, of St. Louis, Mo., for plaintiff.

Brock, Akolt & Campbell, John R. Turnquist and Thomas M. Tierney, all of Denver, Colo., for defendant.

SYMES, District Judge.

The plaintiff, a labor organization within the definition of the Labor Management Relations Act of 1947, known as the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., represents employees of the defendant telephone company in Colorado, New Mexico, El Paso, Texas, Utah, Arizona and Idaho.

The complaint charges defendant with breach of three contracts attached to the complaint. These are so-called bargaining agreements between the plaintiff representing each of the workers in three different departments of the defendant, and Mountain States Telephone and Telegraph Company. One dated January 14, 1947 and two of them May 15, 1947, respectively provide for bargaining and grievance procedures, arbitration, pensions, disability and death benefits, termination allowances, provisions for payroll deductions of dues, which the defendant company agrees to deduct and pay the plaintiff upon receipt of written requests signed by the employees, and other matters usually covered by collective bargaining agreements.

It is alleged the contracts confer rights, privileges and benefits upon the plaintiff of such a nature that money damages for breach of the same would not afford adequate relief.

This plan has been in operation during the lifetime of the contracts. Plaintiff alleges that if the defendant is permitted to improperly terminate the contracts it will cripple the union by depriving it of revenue derived from the checkoff of dues.

It is further alleged that the plaintiff has not given notice of its desire to terminate either of said contracts, and that plaintiff has received no notice from the defendant of the latter's desire or intention to terminate such contracts in accordance with the terms thereof, or in compliance with the Labor Management Relations Act of 1947.

It is then alleged the defendant on May 15, 1948, in violation of the terms of the contracts and of the notice requirements of the Act, supra, notified the plaintiff the contracts were terminated as of midnight, May 15, 1948 (Ex. 9).

Plaintiff alleges that this action on the part of the defendant will leave the relationship between plaintiff and defendant company and its employees subject to unilateral action on the part of either the plaintiff or defendant, contrary to provisions of law and the terms of said contracts, and will interfere with the normal flow of commerce. All contrary to the public policy of the United States as expressed in said Act, which if permitted to continue will deprive the employees of all their rights and privileges granted by said contracts, deny them the use of the ordinary grievance and arbitration procedures established by said contracts, nullify the recognition and collective bargaining procedures, deprive the plaintiff of the income from members' dues, and deny plaintiff and the employees of the defendant other rights and privileges provided for in said contracts, which plaintiff was obligated to perform in its relation with its employees.

The plaintiff then alleges it is sustaining irreparable injury, and unless injunctive relief is granted it will continue to sustain irreparable injury. That it has no plain, speedy or adequate remedy at law, prays for an injunction directing the defendant to continue in full force and effect said contracts until the same are terminated according to the terms of said contracts, or in the manner provided by law.

Defendant, by answer, admits the making of said contracts; that plaintiff has received no notice from the defendant of its desire or intention to terminate the same. Alleges beginning February 18, 1948, there was correspondence between the parties—reference to which is made. That plaintiff orally requested defendant to communicate to the plaintiff in writing its position with respect to the termination of the contracts, to which defendant replied by letter dated May 15, 1948 (Ex. 9). Further, that no agreement was reached by May 15, 1948 to amend or modify the contracts.

Other defenses pleaded are: The complaint fails to state a cause of action, the court has no jurisdiction, plaintiff is not entitled to injunctive relief, and has a plain, speedy and adequate remedy at law.

Plaintiff's motion for preliminary injunction argued on June 11, 1948, was on the question of jurisdiction. The court held tentatively that Tit. III, "Suits by and against labor organizations", § 301 (a, b) of the Act, conferred jurisdiction on district courts. It was thereupon stipulated that the status quo would not be disturbed, and the matter was set down for June 30th for final argument on all questions involved. On that date the matter was fully argued and briefs have been filed.

Sec. 301(a) and (b) of Tit. III of the Act is as follows:

"(a) Suits for violation of contracts between an employer and a labor organization * * * may be brought in any district court of the United States having jurisdiction of the parties".

"(b) Any such labor organization [which represents employees in an industry affecting commerce], may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States".

Unfair labor practices are defined in § 8 and the issues made here do not come within the definition thereof. The defendant's contention is that when this section is read in connection with other sections of the Act—together with the Clayton, 38 Stat. 730, and Norris-LaGuardia, 29 U. S.C.A. § 101 et seq., Acts—district courts have no jurisdiction of a case such as this, and that any unfair labor practice as defined in the Act is subject to enforcement, or as

Sec. 10(a) provides: "The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce".

An examination of the complaint discloses that there is no unfair labor practice or dispute alleged as that term is defined in § 8 of the Act. The issue made by the pleadings before us is simply one for the enforcement of a contract openly arrived at between the parties, which the defendant claims has been cancelled by plaintiff pursuant to its terms, but which the plaintiff claims is still in force. True its terms affect the relations between the defendant and employees, but there is nothing in the pleadings from which it can be said that an unfair labor practice is involved. According to the terms of the agreement—as well as the provisions of the Act § 8(d) (1)—either party had the right to terminate the contract upon 60 days' notice in writing. The correspondence attached to the answer, which the defendant relies upon as constituting notice of termination, may be summarized as follows:

On February 18, 1948 the plaintiff union addressed a communication to the telephone company in which it stated among other things: "the union desires a meeting with management beginning March 3, 1948 for the purpose of collective bargaining".

Also saying it was the union's desire to amend all agreements covering the units which it represents, and: "In addition we wish to consider amendments and modifications of the specific provisions as applied to the separate units; and to mutually explore present economic factors, including consideration of the general rise in the cost of living; as a basis for a wage increase for our members".

This was the first of a series of letters back and forth, concluded by a letter of May 15, 1948 by Mr. Morris, Vice-President of the telephone company, stating the Company considers "by virtue of the Union's written notices to the Company of its intention to amend and modify the existing contracts, that said contracts will terminate at midnight on May 15, 1948, unless, of course, agreement is reached prior to that time".

And, continuing: "The Company is willing to continue to bargain in an effort to reach agreement".

A close scrutiny of this correspondence indicates that neither party ever expressly denounced the contracts, or attempted, or intended to, exercise the 60 day option to cancel the same. On the contrary it indicates the parties were sparring back and forth. Reference is made to several in-

formal discussions between the parties, which are not of record. The union in its letter of February 26, 1948, indicated several points they wanted to bargain on, such as: "the union feels that a meeting at the departmental levels of organization as you suggest, would be completely sterile of any constructive results, and that progress in this matter can only be made by preliminary discussion and a transfer of ideas between a union committee such as we have suggested, and a similar management committee with representatives of each department as members".

And, further: "In view of our membership's wishes as manifested by our present union structure, this seems to be the only logical method of reaching an agreement which might be used as a basis for negotiating any specific provisions as applied to the separate units".

In fact all the correspondence relates to a desire on the part of the union to negotiate (letter of February 26, 1948) "for the purpose of amending the current collective bargaining contract covering wages, hours and other conditions of employment, which would otherwise be automatically renewed beginning May 15, 1948".

In the defendant telephone company's letter of March 3, 1948, they refer to "the setting up of a negotiating committee to consider an overall contract embodying provisions common to each department, * * * we do not think that this is a practicable or desirable method of carrying on negotiations. In the meantime I repeat that the management representatives of the established bargaining units are ready to meet at reasonable times and confer with the union representatives relative to any matters properly to be bargained or relative to negotiating new contracts *or modifications of present contracts*". (Emphasis ours).

And finally on March 23, 1948, the union wrote the telephone company: "We also wish to initiate a new agreement of general application to the units we represent".

And on March 29, 1948 the telephone company replied, saying, among other things: "It is our understanding that you desire to consider changes, amendments, and modifications, of existing agreements".

From this correspondence it appears that at no time did either party give a clearcut notification of its exercise of its right to abrogate the existing contracts at the end of 60 days. The most said is the unions showed dissatisfaction with certain provisions, and a desire to negotiate modifications of the existing agreements, and make new agreements on matters not already covered by said agreements. That is a far cry from a formal notice of cancellation of an existing agreement, or of a novation. See Oil Workers Inter. Union, etc., v. Texoma Nat. Gas. Co., 5 Cir., 146 F.2d 62, at pages 64, 65. The correspondence set forth in the answer—upon which defendant relies—does not spell compliance with the provisions of the Act or terms of the contract respecting cancellation. In argument counsel for the telephone company in referring to this question of notice stated: "They say we didn't give it. They say they didn't give it. We say they did give it".

See 46 C. J. p. 575, IV and 17 C.J.S., Contracts, § 374 et seq., page 859. Also Williston on Contracts, Vol. III, § 1869, p. 3199, "Requisites for a Novation". P. 3200, § 1870, Assent of all parties necessary to a simple novation.

It will be noticed in the case at bar that there is no labor dispute, no strike, fighting, violence or failure on the part of the local authorities to maintain order and prevent violence; nor any demand for higher wages, etc., or threat of strike—the evils the Norris-LaGuardia Act was intended to protect the individual workman from. That is, stop employers from obtaining injunctions that would bring about a complete suppression of the employees' ability to act together through their representatives.

This is evidenced by the fact that defendant has refused to honor the provisions which provide for recognition of the union, the arbitration provisions, grievance provisions and, as stated in the argument, has refused to honor the dues deductions payable to the plaintiff organization and authorized by voluntary dues deduction cards signed by the employees. The failure to carry out the latter provision means very serious damage to the plaintiff organ-

ization, as it cuts off its main income. We conclude the contract is still in force.

It is quite clear the plaintiff has no adequate remedy at law. Damages cannot be adequately measured for violation of the provisions of the contract, such as grievance procedure, arbitration, pensions, disability benefits, termination allowances, etc. To sum up: The contract confers rights and benefits on both parties that cannot clearly be ascertained or measured in damages. That contracts providing for check-off of union dues will be specifically enforced. See Sanford v. Boston Edison Co., 316 Mass. 631, 56 N.E.2d 1, 156 A.L.R. 644: "Specific performance of a collective bargaining agreement will be granted where damages are an inadequate remedy and specific enforcement will not involve too great practical difficulties".

This case also holds a decree requiring a defendant company to recognize the collective bargaining agreement does not violate the state anti-injunction statute. See also Restatement of the Law of Contracts, Vol. 2, § 358, p. 633, and § 359, p. 638 and 639(c).

Amazon Cotton Mills Co. v. Textile Workers Union, 4 Cir., 167 F.2d 183, discusses the effect of the Norris-LaGuardia Act upon the National Labor Relations Act, and holds Federal trial courts are without jurisdiction to redress by injunction or otherwise unfair labor practices, which the Act defines. The discussion by Judge Parker is exhaustive. He holds, 167 F.2d page 186: That under § 10(j) district courts are given jurisdiction to grant injunctions on application of the board when it charges an unfair labor practice under § 10(l), and are given jurisdiction to issue injunctions upon application of an officer or regional attorney of the board in certain cases involving jurisdictional strikes and secondary boycotts. And that upon the application of the Attorney General only, they are authorized to issue injunctions, notwithstanding the provisions of the Norris-LaGuardia Act in cases involving strikes and lockouts affecting interstate commerce and imperiling the national health and safety. And concludes with the statement: "In no other cases does the act confer jurisdiction upon the District Courts to deal with unfair labor practices".

Continuing Judge Parker says § 301(b) of the Act provides that a labor organization may sue or be sued in the courts of the United States " 'as an entity and in behalf of the employees whom it represents' ".

And points out the distinction between that provision and § 301(a), which "confers on the District Courts jurisdiction of suits between employers and labor organizations for violation of contracts".

This provision, we think, confers jurisdiction on district courts of the issues made in the case at bar, which are essentially for the violation of a contract between the labor organization and its employers. Granting, of course, as we must that there is nothing in the Act which "even vaguely supports the contention that its effect was to vest jurisdiction in the District Courts to grant relief against unfair labor practices".

Continuing Judge Parker, 167 F.2d page 188, refers to the Senate report on the bill that five specific practices by labor organizations, should be defined as unfair labor practices against which the public must be protected, and which may be restrained by the lower Federal courts. Continuing, the court makes the distinction between suits involving unfair labor practices—by far the most numerous arising under the Act—and a case such as the one at bar—a suit for the enforcement of a contract, and the only type of case the district courts are given original jurisdiction over.

He then points out that the amendments to the National Labor Relations Act did not change the method by which unfair labor practices were dealt with under the Act or vest district courts with jurisdiction of these matters, except to the limited extent that jurisdiction of these matters was expressly conferred.

And, further, 167 F.2d page 187: The courts are given jurisdiction to issue injunctions in certain cases, notwithstanding the provisions of the Norris-LaGuardia Act in cases involving strikes, lockouts, etc. And Judge Parker states, 167 F.2d page 187, that the Act has not conferred

jurisdiction on district courts to deal with unfair labor practices.

Discussing § 301(b) of the Act, the court says the effect of these provisions was to make clear the capacity of labor organizations to come, or be brought, into court as parties, and that § 301(a) confers on the district courts jurisdiction of suits between employers and labor organizations for violations of contracts. And that § 303(b) authorizes district courts to entertain suits for damages on account of strikes and boycotts made unlawful by § 303(a).

All the cases cited by the defendant involve unfair labor practices. For instance, in *United Packing House Workers of America, et al. v. Wilson & Co., Inc.*, D.C. Ill., 80 F.Supp. 563, at page 566, 15 Labor Cases 73985, at page 73988, the court said: "The gravamen of the complaint is that defendant committed unfair labor practices. The relief sought * * * is that defendant be enjoined from committing such unfair labor practices".

P. 73985 (syllabus): "Nothing in the LMRA changed the exclusive jurisdiction of the Board in such matters so as to permit injunctive relief in a Federal district court at the request of private parties, since (1) the jurisdiction conferred on the district courts by that Act is limited to interlocutory injunctive relief against strikes threatening national health and safety on the petition of the Attorney General, *and damage suits between private parties for breach of a collective bargaining agreement * * *"*. (Emphasis ours).

In *United States v. United Mine Workers of America*, D.C., 70 F.Supp. 42, page 44, Judge Goldsborough holds the court had the same power as it would have had prior to the passage of the Norris-LaGuardia and Clayton Acts, saying:

"The Court thinks that undoubtedly under the general rules which the Court has spoken of, the Norris-LaGuardia Act did not and does not apply; and * * * the Court had the same rights that the Court would have had prior to the passage of the Norris-LaGuardia Act and the Clayton Act.

"So it is perfectly clear that prior to the Norris-LaGuardia Act and the Clayton Act, a court of equity had the right to enjoin a labor union * * *".

Tit. III, which contains § 301(a), (b), etc., is an entirely new provision. The query naturally arises, why was it enacted as an amendment to the original Act, were it not the intent to remove the exclusive jurisdiction of the board and give the courts the right to exercise equity powers in cases not involving unfair labor practices. Further, the relief sought here is wholly foreign to anything prohibited by the Norris-LaGuardia or Clayton Acts, which were aimed at cases involving strikes, lockouts, picketing, etc.

In conclusion we are of the opinion, and find: (a), the court has jurisdiction, as the case does not involve a labor dispute as defined in the Act, and falls within the exception § 301(a), (b), vesting exclusive jurisdiction in the board. (b), the contract is still valid, not having been cancelled by either party, either pursuant to the terms of the contract or the Act itself. And (c), upon the authorities cited the plaintiff has no adequate remedy at law, and injunctive relief is indicated.

The court is conscious that it may be exercising jurisdiction that does not exist. But, as Chief Justice Marshall said in *Cohens v. Virginia*, 6 Wheat. 264, at page 404, 5 L.Ed. 257: "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given".

Findings of fact and conclusions of law agreeable to these views may be presented by counsel for discussion.