Filed 12/20/16

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| SAN JOAQUIN COUNTY CORRECTIONAL OFFICERS ASSOCIATION, | C079413 |
| Plaintiff and Appellant, | (Super. Ct. No. 39-2013-00302847-CU-CO-STK) |
| v. | |
| COUNTY OF SAN JOAQUIN, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Barbara A. Kronlund, Judge. Affirmed.

Goyette & Associates and Richards P. Fisher for Plaintiff and Appellant.

Renne Sloan Holtzman Sakai LLP, Jeffrey Sloan and Erick W. Shiners for Defendant and Respondent.

Kamala D. Harris, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Tamar Pachter, Supervising Deputy Attorney General, and Nelson R. Richards, Deputy Attorney General, for State of California as Amicus Curiae on behalf of Defendant and Respondent County of San Joaquin.

1

Plaintiff San Joaquin County Correctional Officers Association (CCOA) appeals from a judgment in favor of the County of San Joaquin (County) in this dispute over pensions payments, specifically, cost-of-living adjustments (COLAs), for CCOA members. The case involves the interplay between the California Public Employees' Pension Reform Act of 2013 (PEPRA) (Gov. Code, § 7522, et seq.)[1] and the County Employees Retirement Law of 1937 (CERL) (§ 31450, et seq.).

Under CERL, the County had the right to reduce any contributions it chose to make toward what would otherwise have been the employee's half-share of COLA payments. Under PEPRA, limits on any such government contributions take effect after 2018.

After the County reduced the COLA contributions it had been making, CCOA contended, in effect, that PEPRA shielded its members from any such reductions until 2018. We agree with the trial court that this is an incorrect interpretation of the law. PEPRA was intended to rein in what was perceived by the Legislature to be overly generous retirement packages for public employees, but delayed the effective date of some provisions to ease the transition and allow some changes to be negotiated gradually. It was not designed to shield compensation packages that were already subject to reduction under prior laws, specifically, CERL. Accordingly, we shall affirm.

## BACKGROUND

Because this case requires the application of statutes to undisputed facts, a matter subject to de novo review by this court, we bypass the rigid three-step analysis ordinarily applied to review summary judgments. (See, e.g., *Jimenez v. Roseville City School Dist.* (2016) 247 Cal.App.4th 594, 602, fn. 2.) On cross-motions for summary judgment, the

---

[1] Further undesignated statutory references are to the Government Code.

trial court granted the County's motion and denied CCOA's. We set forth the factual and legal background not disputed by the parties.[2]

The San Joaquin County Employees' Retirement Association administers a pension fund for County employees, including CCOA members. Retirees receive a pension benefit and "post-retirement COLA adjustments."

CERL, which governs county pension boards, includes a default provision (§ 31873, subd. (a)) that any COLA increase is shared equally by employee and employer. However, as permitted by CERL (*ibid*.), in 1975 the County passed a resolution agreeing to pay the employee share. This is referred to by the parties as a "pickup." This ability to pay the employee share was also consistent with a more general CERL provision allowing a county "to pay any portion of the contributions required to be paid by a member" (§ 31581.2, subd. (a)), although such a decision, subject to a meet-and-confer requirement, could be amended "at any time." (*Id*., subd. (b).)

Before PEPRA was passed, section 31581.2 provided as follows:

> "The board of supervisors or the governing body of the district may agree to pay any portion of the contributions required to be paid by a member. All payments shall be in lieu of wages and shall be reported simply as normal contributions and shall be credited to member accounts.

> "*The enactment of a resolution pursuant to this section shall not create vested rights in any member. The board of supervisors or the governing body of the district may amend or repeal the resolution at any time*, subject to the provisions of Sections 3504 and 3505, or any similar rule or regulation of the county or district." (Stats. 1997, ch. 223, § 1, pp. 1017-1018, italics added.)[3]

---

[2] The California Attorney General has filed an amicus curiae brief supporting the County's position, and appeared as amicus curiae at argument in the trial court and this court.

[3] Although section 31581.2 was amended by PEPRA (see Stats. 2013, ch. 247, § 17), the earlier version illustrates the County's pre-PEPRA powers and gives additional context to the interplay between PEPRA and CERL. Sections 3504 and 3505, referenced in this

3

The County and CCOA negotiated a new memorandum of understanding (MOU) in September 2012 that required CCOA members to pay their default half of COLAs, that is, it ended the County's COLA pickup.  The members rejected the MOU, creating a bargaining impasse.  In January 2013, the County unilaterally imposed the default COLA payments on CCOA as part of its "last, best and final offer."[4]

The year before PEPRA was passed, section 31631.5 was adopted as follows:

> "(a)(1)  Notwithstanding any other provision of this chapter, a board of supervisors or the governing body of a district may require that members pay 50 percent of the *normal cost of benefits*.  However, that contribution shall be no more than [specified percentage amounts for different types of employees].

> "(2)  Before implementing any change pursuant to this subdivision for any represented employees, the public employer shall complete the good faith bargaining process as required by law, including any impasse procedures requiring mediation and factfinding. *This subdivision shall become operative on January 1, 2018*.  This subdivision shall not apply to any bargaining unit when the members of that unit are paying at least 50 percent of the normal cost of their pension benefit or are subject to an agreement reached pursuant to paragraph (1).  Applicable normal rate of contribution of members means the statutorily authorized rate applicable to the member group as the statutes read on December 31, 2012.

> "(b)  *Nothing in this section shall modify a board of supervisors' or the governing body of a district's authority under law as it existed on December 31, 2012, including any restrictions on that authority, to change the amount of member contributions*."  (Stats. 2012, ch. 296, § 33, italics added.)

---

section, refer in part to meet-and-confer requirements in the context of public employment bargaining under the Meyers-Milias-Brown Act.  (See § 3500.5.)

[4]  After a detour to the Public Employment Relations Board, which ultimately ruled it had no jurisdiction over this particular labor dispute between the parties, CCOA filed the present action to resolve the controversy.

As part of PEPRA, section 31873 was amended so that it now reads as follows:

"(a) Any increases in contributions shall be shared equally between the county or district and the contributing members. . . . The board of supervisors by a majority vote may elect to pay part of the costs of the contributions which would otherwise be assessed to the individual members.

"(b) Notwithstanding subdivision (a), pursuant to Section 7522.30, the board of supervisors shall not pay any part of the costs of the member contributions of new members as defined in subdivision (f) of Section 7522.04." (Stats. 2013, ch. 247, § 47.)[5]

On these undisputed circumstances, the trial court reasoned that because section 31631.5, subdivision (b) preserved the County's right (both explicitly under § 31581.2 and by implication under § 31873) to end the COLA pickup, CCOA's position that section 36131.5, subdivision (a) *insulated* it from any employee compensation reductions until 2018 was not linguistically tenable. CCOA timely appealed.[6]

---

[5] With exceptions not relevant here, under PEPRA a new "employee" or "member" is one employed by the government or who joins a public retirement system for the first time on or after January 1, 2013. (§ 7522.04, subds. (e)(1), (f)(1).) Further, "[e]qual sharing of normal costs between public employers and public employees shall be the standard. The standard shall be that employees pay at least 50 percent of normal costs and that employers not pay any of the required employee contribution." (§ 7522.30, subd. (a).)

[6] The notice of appeal was timely because May 31 was a Sunday. (See Code Civ. Proc., §§ 10, 12; *Hoover v. Sweitzer* (1939) 34 Cal.App.2d 441, 441-442.) As our colleague Associate Justice Ronald B. Robie once cogently observed: "[E]very lawyer in California should have a sign posted in his or her office which says '*Never do anything on the last day or at the last moment*.' " (*Imagistics Internat. Inc. v. Department of General Svcs.* (2007) 150 Cal.App.4th 581, 595 (conc. opn. of Robie, J.).) Still sage advice, rarely heeded.

## DISCUSSION

As the parties agree, because this case turns on the application of statutes to undisputed facts, our review is de novo. (See *Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1384.)

PEPRA was designed to *limit* public employee retirement compensation--within constitutional bounds--in the face of concern over unfunded liabilities. "In 2011, the Little Hoover Commission advised the Governor and the Legislature: 'California's pension plans are dangerously underfunded, the result of overly generous benefit promises, wishful thinking and an unwillingness to plan prudently. Unless aggressive reforms are implemented now, the problem will get far worse, forcing counties and cities to severely reduce services and lay off employees to meet pension obligations.' . . . The situation was described as 'dire,' 'unmanageable,' a 'crisis' that 'will take a generation to untangle,' and 'a harsh reality' that could no longer be ignored." (*Marin Assn. of Public Employees v. Marin County Employees' Retirement Assn*. (2016) 2 Cal.App.5th 674, 681, review granted Nov. 22, 2016, S237460.) PEPRA, part of the Legislature's response to this perceived problem, in part "made fundamental alterations in the manner in which public pensions are calculated." (*Id*. at p. 683.)[7]

Thus, from the outset we observe that CCOA's position that PEPRA provides a shield to its members seems inconsistent with the general purpose of PEPRA. And on inspection of the particular statutes at issue, CCOA's position proves untenable.

As the trial court correctly reasoned, under CERL the County has always possessed the ability to reduce or eliminate the "pickup" of the employee portion of COLA payments it chose to bestow on its employees via its 1975 ordinance, as then

---

[7] We express no view about the *Marin Assn*. court's interpretation of precedent regarding the validity of changes to retirement benefits, we merely agree with its account of the historical backdrop animating recent pension reform legislation in California.

6

permitted by statute, and then apparently made a part of prior MOUs with CCOA. Its ability to change the pickup was constrained by limitations external to CERL, specifically, the bargained-for labor MOUs. However, when the last MOU expired, and the CCOA members rejected a new MOU, the County was free to impose its last, best, offer on CCOA. (See, e.g., *City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 78 ["It is settled after negotiating to impasse under the [Meyers-Milias-Brown Act] City is entitled to impose its last, best offer"] (*El Cajon*).) This last offer eliminated the COLA pickup, consistent with the statutory authority the County has always possessed.

CCOA argues that the pickup could not be reduced until 2018, relying on a tortured interpretation of a section of PEPRA as follows: Section 31631.5, subdivision (a)(1) provides that a public employer may require that members pay half the "normal cost of benefits" with certain limitations for certain categories of employees. Subdivision (a)(2) provides in part that the terms of subdivision (a) do not become operative until 2018, and that "[b]efore implementing any change pursuant to this subdivision for any represented employees, the public employer shall complete the good faith bargaining process as required by law, including any impasse procedures requiring mediation and fact-finding." CCOA interprets this statute to mean no reduction in a COLA--which it views as part of the "normal cost of benefits"--is possible absent this bargaining process.

However, whether or not a COLA is a "normal cost of benefits," a point we need not resolve,[8] CCOA's reading ignores subdivision (b) of section 31631.5, which partly

---

[8] The point was explored at oral argument in the trial court; the court found the term undefined and therefore ambiguous in an earlier order overruling a demurrer and denying a motion to strike part of the complaint. Although CCOA devotes much of its briefing to the question of whether a COLA is or is not a "normal cost of benefits," we agree with the Attorney General that this definitional point is irrelevant to our consideration of the legal issue presented: whether the County retained the power to eliminate the COLA pickup.

7

provides: "Nothing in this section shall modify a board of supervisors' . . . authority under law as it existed on December 31, 2012, including any restrictions on that authority, to change the amount of member contributions." As explained above, the County had the power to change the COLA before 2012, subject to external labor laws (i.e., the Meyers-Milias-Brown Act), and once a bargaining impasse was reached, had the power to impose its last, best offer, which eliminated the COLA pickup the County had elected to provide by local ordinance--but had not been statutorily compelled to provide--since 1975. (See *El Cajon*, *supra*, 49 Cal.App.4th at p. 78.)

CCOA attempts to bolster its position by relying on a different part of CERL, (the immediately preceding) section 31631, which in subdivision (a) addresses the need for labor bargaining over employee contributions for retirement benefits. However, subdivision (b) of section 31631 provides: "Nothing in this section shall modify a board of supervisors' . . . authority under law as it existed on December 31, 2012, including any restrictions on that authority, to change the amount of member contributions." This language parallels the language of section 31631.5, subdivision (b). We do not discern in this statute any restriction on the County's preexisting powers to impose a last, best offer in the face of a labor impasse, even if that offer contains reductions previously permitted to be made. Nor do we agree that this interpretation would make subdivision (a), generally requiring bargaining, "meaningless" as CCOA claims, because in most cases bargaining results in an MOU, not an impasse. Subdivision (b) of section 31631, like subdivision (b) of section 31631.5, applies only to the latter, extraordinary, case.

In short, the County always had the power to eliminate the COLA pickup, subject to labor laws, and those laws permitted the County to do so in the event of a bargaining impasse, which occurred. Nothing in PEPRA limited the County's power in this regard.

8

## DISPOSITION

The judgment is affirmed.  CCOA shall pay the County's costs of this appeal.
(See Cal. Rules of Court, rule 8.278(a).)


/s/
Duarte, J.

We concur:


/s/
Nicholson, Acting P. J.


/s/
Butz, J.